

_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
August 15, 2025

_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-14240-gs |
| | Chapter 7 |
| MIOMNI GAMING LTD., | |
| Debtor(s). | Adv. Proc. No. 22-01166-gs |

| | |
|---|---|
| SBC NEVADA, LLC, Individually, and as the Successor in Interest to the Estate Claims of Miomni Gaming Limited, | <u>Hearing Date</u><br>DATE: December 10, 2024<br>TIME: 10:00 a.m. |
| Plaintiff(s), | |
| v. | |
| MIOMNI HOLDING, LIMITED, a Foreign Holding Company (Terminated);  MIOMNI SPORTS LTD., a Foreign limited-liability company; MIOMNI LTD., a Nevada limited liability company; ANDREW WATT,  Individual; MICHAEL VENNER, Individual; PHILLIP KONSTAM, Individual; MIOMNI HOLDINGS LIMITED, a Foreign Holding company; MIOMNI HOLDINGS, LTD., a Foreign limited-liability company; | |
| Defendant(s). | |

1

## MEMORANDUM DECISION ON MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Before the court is plaintiff SBC Nevada, LLC's (SBC) Motion for Partial Summary Judgment as to Miomni Sports Limited (Motion).[1] This Motion seeks to establish that various transfers allegedly made by the debtor, Miomni Gaming Ltd. (Gaming), to Miomni Sports Ltd. (Sports) are avoidable as fraudulent transfers, as well as determinations of successor liability, alter ego, and relief declaring that the debtor is the true owner of certain intellectual property related to mobile sports betting applications. Sports originally appeared in the adversary proceeding but subsequently filed an insolvency proceeding in the United Kingdom and an ancillary proceeding under chapter 15 in this district. The bankruptcy court granted relief from stay in the chapter 15 proceeding to permit SBC to liquidate its claims against Sports as it ultimately seeks to extend Sports's liability to other non-debtor defendants.

Sports has not opposed the motion for partial summary judgment. Yet, SBC is not automatically entitled to the relief it seeks. A movant on summary judgment must still carry its burden of proof even absent any opposition. Towards this end, SBC has submitted a significant amount of evidence to support its theory that Gaming fraudulently transferred valuable mobile sports betting applications to Sports after an adverse state court judgment. The evidence demonstrates a coordinated effort to shift Gaming's contracts with several casinos to Sports. However, the evidence further shows that Gaming never owned the intellectual property comprising the betting applications. Nor did it have exclusive, long-term rights to that intellectual property: Gaming held a non-exclusive license to use, develop, and sublicense the intellectual property.

The underlying intellectual property at all times was owned by defendant Miomni Holdings, Ltd (Holdings), the parent company of both Gaming and Sports. Holdings was also owned and controlled by the individual defendants. Holdings granted Sports a new license to use the same intellectual property that Gaming was using. After the state court entered its judgment,

---

[1] Adv. ECF No. 418.

2

Holdings terminated Gaming's license to use the intellectual property. SBC has not challenged Holdings' termination of Gaming's license, or Holdings' ability to license the intellectual property to Sports. As a result, SBC has failed to establish that Gaming transferred the mobile sports applications and intellectual property to Sports.

Gaming did have contracts to provide mobile sports applications to several casinos. But Gaming lost the ability to service those contracts when Holdings terminated its license. Ultimately, the evidence presented shows that Gaming did not transfer any contracts to Sports; the casinos simply entered into new contracts with Sports, in part because their contracts with Gaming had either already expired when Gaming's license was terminated or were set to expire. Thus, SBC has not established that Gaming transferred the casino contracts to Sports.

Absent evidence that Gaming transferred some property interest to Sports, SBC has failed to prove a fundamental element of the fraudulent transfer claims. Similarly, the failure to establish the transfers to Sports, or any resulting debt, precludes entry of summary judgment on SBC's other claims.

## **Background**

Defendants Michael Venner, Andrew Watt and Phillip Konstam own Miomni Holdings, Ltd., a foreign limited liability company registered in the United Kingdom.[2] Holdings, in turn,

---

[2] Sports ECF No. 27 at APEN0032:25-APEN0033:8; *id.* at APEN0001; APEN0033:12-14. "Sports ECF No." refers to documents filed on the chapter 15 case docket of *In re Miomni Sports, Ltd.*, Case No. 24-11963-gs. Per footnote 1 of the Motion, SBC's exhibit references throughout the Motion and the accompanying statement of undisputed facts are to those exhibits docketed at Sports ECF Nos. 25-38. The court also notes that SBC frequently omitted pin cites to its exhibits leaving the court to scour through the exhibits to verify or understand the factual point being made. *See, e.g.,* Adv. ECF No. 418 at 14:10-12 (quoting deposition testimony but citing only generally to the exhibit, Exhibit 232, a 176-page deposition transcript). This alone warrants the denial of the Motion. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record]."); *Chaney v. Grigg (In re Grigg)*, 2013 WL 5945793, at *5 (Bankr. W.D. Pa. Nov. 6, 2013); *In re Harmony Holdings, LLC*, 393 B.R. 409, 416 (Bankr. D.S.C. 2008) ("[i]t is not the Court's function to endlessly explore the record for facts that support the case of either party."). In the interests of addressing the merits of the Motion, the court has nonetheless spent the additional time necessary to review SBC's arguments.

3

owns Gaming and Miomni Media Ltd, which ultimately was renamed Sports. Holdings owns other dissolved or dormant companies, including: Miomni Platform Ltd; Miomni Cloud Ltd; Cool Room Live Ltd; and Miomni Ltd.[3] Venner and Watt have served as the officers and directors of Holdings, Gaming and Sports.[4] Each company is registered in the United Kingdom.

As for the business of these entities, SBC states simply: "Miomni marketed, sold, and implemented software (the 'Miomni Systems')."[5] Critically, SBC fails to identify which Miomni entity owned, or did, what. Instead, it generically describes the software as a "middleware platform" that encompassed "the entire solution provided by or through the Debtor, including, without limitation, middleware, back-end services, content management services, content delivery services, and geolocation services owned, operated by or licensed by the Debtor."[6] This included "all discrete systems, software, and services (other than an account wagering platform) require[d] for mobile sports betting operations at licensed sportsbooks in the United States, and more particularly in Nevada."[7] The geolocation services enabled the sportsbook clients to comply with existing laws limiting any betting to permitted locations (for purposes of this dispute, Nevada).[8]

Importantly, Holdings owned the software system known and referred to by SBC as the Miomni Systems, which includes the "middleware platform" and the "entire solution" for purposes of this decision.[9]

### A. Holdings-Gaming License Agreement.

On November 18, 2014, Gaming entered into a License Agreement with Holdings that granted Gaming a "non-exclusive, non-transferable License to use the Miomni technology, i.e. Middleware, Geolocation technology, Mobile applications for iOS and Android" (Holdings-

---

[3] Sports ECF No. 27 at APEN0001.
[4] *Id.* at APEN0011 (Holdings and Gaming); Sports ECF No. 34 at APEN1486.
[5] Adv. ECF No. 419 at 8, ¶ 19.
[6] *Id.*
[7] *Id.* at ¶ 20.
[8] *Id.* at 9, ¶ 24.
[9] Sports ECF No. 27 at APEN0107-108.

Gaming License).[10] The schedules to the Holdings-Gaming License further specified that the Miomni technology licensed to Gaming included "middleware platform geo-location technology and mobile applications for sports betting," in the form of "object code and source code."[11] The Holdings-Gaming License had a term of ten years, expiring on November 17, 2024.[12] The license fee was listed as zero British pounds.[13] The "Approved Purpose" of the Holdings-Gaming License was described as "[s]ublicensing object code and the modification of source code. *(Any modification of source code or object code automatically becomes the Intellectual Property of the Licensor.)*"[14] The Holdings-Gaming License explicitly stated, "[a]ll Intellectual Property Rights over and in respect of the Asset are owned by Licensor. *The Licensee does not acquire any rights of ownership in the Asset.*"[15] "Asset" is defined under Item 6 of the schedule to the Holdings-Gaming License as "[t]he Miomni technology, i.e. middleware platform geo-location technology and mobile application for sports betting."[16] Venner signed the Holdings-Gaming License as director of Holdings, and Watt signed it as director of Gaming.[17]

> **B.    Gaming's Nevada Casino Contracts.**

Beginning in early 2015, Gaming entered into contracts with several casinos to develop software to permit mobile gaming applications. In early October 2015, Gaming granted Wynn Las Vegas, LLC (Wynn) a license to use the Miomni remote sports and race wagering software in conjunction with its own sports and race book operations pursuant to a "Software and Solution Development and Services Agreement" (Gaming-Wynn Agreement).[18] Under that agreement Wynn granted Gaming a reciprocal license to utilize Wynn's intellectual property strictly for

---

[10] Sports ECF No. 33 at APEN1345.
[11] *Id.* at APEN1352.
[12] *Id.*
[13] *Id.*
[14] *Id.* [emphasis added].
[15] *Id.* at APEN1347 [emphasis added].
[16] *Id.* at APEN1352.
[17] *Id.* at APEN1350-51.
[18] Sports ECF No. 28 at APEN0374-94.

purposes of creating and operating the remote sports and race wagering operations at Wynn.[19] Gaming charged Wynn a one-time platform set up fee, with monthly use fees assessed thereafter.[20] The Gaming-Wynn Agreement was signed by Venner as CEO of Gaming.[21]

On June 26, 2016, Gaming registered as a domestic limited liability corporation in the state of Nevada.[22] On August 21, 2017, Gaming filed its application with the Nevada Gaming Commission Board (NGCB) for geo-location and information technology service provider licenses.[23] At a public hearing conducted by the NGCB on May 2, 2018, the NGCB approved Gaming's license application.[24]

During this period, Gaming entered into similar agreements with South Point Hotel and Casino (South Point),[25] Stations Casinos LLC (Stations),[26] and Monarch Casino & Resort, Inc. (Atlantis).[27] As with Wynn, each agreement provided reciprocal licenses necessary to properly operate a mobile, remote race and sports book application. Gaming charged each a one-time platform set up fee and monthly use fees assessed thereafter. Watt signed each of the agreements on behalf of Gaming. The agreements with South Point, Stations and Atlantis were each for a period of three years.

As Gaming's agreements with the casinos were set to expire, Gaming extended or amended the agreements, though most of the agreements also contained a provision automatically renewing the agreement unless otherwise elected. Gaming twice amended its

---

[19] *Id.* at APEN0376.
[20] *Id.* at APEN0390.
[21] *Id.* at APEN0386.
[22] Adv. ECF No. 119-8.
[23] Sports ECF No. 32 at APEN1100-03.
[24] *Id.* at APEN1120.
[25] Sports ECF No. 28 at APEN0395-0407.
[26] Exhibit 183 at APEN 2010-29 (under seal). The agreement between Gaming and Stations was filed under temporary seal. Sports ECF No. 44. Subsequently, that and other exhibits were de-designated as confidential. Sports ECF No. 59. Although the court directed SBC to file the de-designated exhibits and an unredacted Statement of Undisputed Facts on the public case docket, to date SBC has not complied with the court's order. *Id.* at 2:8-9.
[27] Sports ECF No. 29 at APEN0408-0421.

agreement with Wynn, extending the term until December 1, 2021.[28] It extended the agreement with South Point through September 5, 2020.[29] The parties extended the Stations agreement through May 2023.[30] Similarly, Gaming's agreement with Atlantis was extended for one year, through March 16, 2021.[31]

### C.    SBC's Agreement with Gaming.

According to SBC's Verified Third Amended Complaint (Complaint), in 2015 it sought to develop software for a mobile device application for on demand sports betting.[32] Specifically, "SBC's application would utilize a casino-to-casino wager, known as 'layoff wagering,' to accomplish the otherwise-prohibited use of funds from one sportsbook to place a wager at a different sportsbook."[33] SBC approached Stadium Technology Group (Stadium) to develop the mobile application.[34] Stadium told SBC it had to work through Gaming's middleware, due to Stadium's exclusivity contract with Gaming.[35] Accordingly, on February 6, 2016, SBC and Gaming signed a Partnership Term Sheet.[36] Under the Partnership Term Sheet, Gaming "committed to, in exchange for cash and equity, be SBC's technical partner in charge of development of the App…."[37] Gaming also was to be responsible for maintaining and supporting SBC's mobile application after it was launched.[38] The agreement provided for a final completion date of July 25, 2016.[39]

---

[28] *See* Sports ECF No. 32 at APEN0950-53.
[29] *Id.* at APEN0959-0960.
[30] Exhibit 184 (under seal).
[31] Sports ECF No. 32 at APEN0989.
[32] Adv. ECF No. 349 at 34-35, ¶¶ 126-131.
[33] Sports ECF No. 32 at APEN1030, ¶ 16.
[34] Adv. ECF No. 349 at 35, ¶ 132.
[35] *Id.* at ¶ 133.
[36] Sports ECF No. 32 at APEN1038, ¶ 50.
[37] *Id.* at ¶ 51.
[38] *Id.* at ¶ 52.
[39] *Id.* at APEN1042, ¶ 67.

### D.    Gaming's West Virginia Joint Venture.

Around the same time Gaming was entering its first agreement with Atlantis in January 2017, "Miomni" - with no designation as to Gaming, Media, Holdings, etc. - entered into a Platform and Source Option Agreement with EnterG Software Solutions Ltd. (EnterG), a Cypriot software developer.[40] EnterG was tasked with creating a Miomni-branded sports betting platform. On March 18, 2018, Gaming executed its right to acquire the platform created by EnterG.[41]

Later in 2018, Gaming entered into a joint venture (Gaming-DNG Agreement) with Delaware North iGaming, Inc. (DNG), a gaming operator based in New York.[42] DNG owned gaming facilities in West Virginia. Pursuant to the agreement, Gaming and DNG were to operate a company called BetLucky Interactive, LLC (BetLucky) to provide online sports wagering in West Virginia (and, ultimately, elsewhere) using Gaming's EnterG platform.[43] DNG owned 51% of the joint venture; Gaming owned the other 49%.[44] Venner signed the Gaming-DNG Agreement as CEO of Gaming.[45] The same day, Gaming entered into a Software License, Development, Support and Services Agreement with BetLucky pursuant to which BetLucky was granted a license to use Gaming's sports wagering software.[46]

Soon thereafter, on February 25, 2019, EnterG attempted to terminate the agreement with Gaming.[47] Subsequently, on March 6, 2019, BetLucky's betting services in West Virginia were interrupted.[48] By examining the object code, Gaming determined that EnterG had entered a "kill switch" in the Miomni-branded platform's object code that enabled it to interrupt BetLucky's

---

[40] Sports ECF No. 33 at APEN1153-65.
[41] *Id*. at APEN1166.
[42] Exhibit 86 (under seal), APEN1171.
[43] *Id.*
[44] *Id.* at APEN1215.
[45] *Id.* at APEN1214.
[46] Exhibit 87 (under seal), APEN1223-1303.
[47] Sports ECF No. 33 at APEN1310.
[48] *Id*. at APEN1304; 1318.

wagering services.[49] As a result, DNG sued Gaming in Delaware state court, alleging Gaming did not acquire the rights from EnterG for use of EnterG's intellectual property; in turn, Gaming sued EnterG in the United Kingdom, seeking a ruling that it *had* acquired those rights. Gaming ultimately prevailed in the United Kingdom litigation and was awarded £125,000.00.[50]

### E.    Miomni Sports is Created.

On December 17, 2019, more than five years after Holdings granted Gaming a non-exclusive license to use and develop the Miomni technology, Holdings entered into a licensing agreement (Holdings-Sports License) with Miomni Media Limited (Media).[51] Media was a dormant subsidiary of Holdings formed in 2012.[52] The Holdings-Sports License was more detailed than the Holdings-Gaming License. This new agreement provided Media a "worldwide, non-exclusive, non-transferable, royalty-free right in the Territory [defined as worldwide] over the Combined Material to…create Derivative Works;…grant sublicenses to Licensee's customers to use any Combined Materials (or part thereof) including as Derivative Works; and…use, adapt and create Derivative Works for Licensee's internal testing, demonstration and development purposes."[53] The new agreement defined "Derivative Works" as "any reproduction or adaptation of the Combined Materials," which in turn were defined as the "Software, Documentation and Tools."[54] The initial term of the license was one year, with a five-year renewal option.[55] The fee for the license was one British pound.[56] The Holdings-Sports License was again signed by Venner for Holdings and Watt for Media.[57]

---

[49] *Id*. at APEN1340, ¶ 27.
[50] *Id.* at APEN1306-17.
[51] Sports ECF No. 34 at APEN1353-68.
[52] Sports ECF No. 27 at APEN0001; APEN0076.
[53] Sports ECF No. 34 at APEN1356.
[54] *Id.* at APEN1354.
[55] *Id.* at APEN1366.
[56] *Id.*
[57] *Id.* at APEN1365.

Nothing in the record shows that Media conducted any business immediately after acquiring the license from Holdings. Nearly two years later, on November 30, 2021, Media changed its name to Miomni Sports Ltd.[58]

**F.    SBC Sues Gaming and Sports Prepares to Conduct Business in Nevada.**

After several years of delays and failures by Gaming to deliver the middleware (namely, operable layoff wagering functionality),[59] SBC sued Gaming for breach of contract on March 4, 2019, only months before Holdings granted Media its license to use the Miomni Systems.[60] Trial began on November 29, 2021, the day before Media changed its name to Sports.[61] The seventh and final day of trial was held several months later on March 3, 2022.[62] Less than two weeks after the close of trial, Sports registered with the Nevada Secretary of State as a foreign limited liability company.[63]

On May 2, 2022, the court entered its 31-page Findings of Fact, Conclusions of Law, and Judgment in favor of SBC against Gaming.[64] The court held that Gaming had damaged SBC in the amount of $5,506,400.00.[65]

Sports registered with the NGCB as an associated equipment manufacturer and distributor later that summer on August 25, 2022.[66]

**G.    Writ of Garnishment.**

In furtherance of the state court judgment SBC obtained a writ of garnishment, which it caused to be served on Gaming's customers, namely, the Nevada casinos. On August 12, 2022, Steve Harris, acting on behalf of South Point, completed the interrogatories attached to the writ

---

[58] *Id.* at APEN1477.
[59] Sports ECF No. 32 at APEN1044-45.
[60] Adv. ECF No. 349 at 36, ¶ 138.
[61] *Id.* at 38, ¶¶ 153-54.
[62] *Id.* at 39, ¶¶ 160, 162.
[63] Sports ECF No. 34 at APEN1483.
[64] Sports ECF No. 32 at APEN1027-1058.
[65] *Id.* at APEN1055.
[66] Sports ECF No. 34 at APEN1490.

served on that casino. South Point answered that it had a software and solutions agreement with Gaming, for which it paid Gaming $4,807.00 per month.[67]

Eric Aldrian of Wynn completed the interrogatories attached to the writ on September 14, 2022, stating that Wynn had a software and solutions development and services agreement with Gaming for which Wynn paid Gaming $10,000 per month.[68]

On September 30, 2022, Jeffrey Welch, Executive Vice President for Stations, completed the interrogatories attached to the writ, stating that Stations had a contract with Gaming for unspecified services through May 31, 2023, for which it paid Gaming $57,850.00 per month.[69]

### H.    The Holdings-Gaming License is Canceled.

On August 31, 2022, shortly after Sports registered with the NGCB, Holdings' shareholders – Venner, Watt, and Konstam – conducted a shareholder meeting via Zoom.[70] The minutes of that meeting reflect that, "[t]he Shareholders of Miomni Holdings Limited have voted to relinquish licensing rights to Miomni Gaming Limited as it has come to light that Miomni Gaming Ltd. maybe [sic] trading insolvent due to a combination of bad debts and legal disputes in the U.S."[71]

### I.    Sports Contracts with the Casinos.

SBC alleges that while the state court action was pending, and even before Sports registered with the Nevada Secretary of State on August 25, 2022, Gaming began transferring its assets to Sports.[72] Specifically, SBC contends that Gaming transferred its casino contracts to Sports. Unfortunately, SBC never identifies the specific dates of any transfer. Instead, it has provided a multitude of documents describing an evolving situation that began before the state court trial and continued well afterwards.

---

[67] *Id.* at APEN1577-83.
[68] Sports ECF No. 35 at APEN1674-76.
[69] Adv. ECF No. 319 at 142-144.
[70] Sports ECF No. 34 at APEN1576.
[71] *Id.*
[72] Adv. ECF No. 349 at 38, ¶¶ 157, 159.

### 1.    Wynn.

In late 2021, Gaming was negotiating a third amended agreement with Wynn to replace the then-current agreement set to expire on December 1, 2021. On multiple occasions, Wynn requested a clean copy for signature.[73] Finally, on December 13, 2021, Venner emailed the Wynn representatives, stating:

> We are reorganising our group companies and we will be running sports betting out of Miomni Sports Limited (100% owned by Miomni Holdings Ltd as is Miomni Gaming Ltd).
>
> Legal have asked for the extra redline in the attachment. Nothing changes for Wynn just being invoiced out of another cost centre….[74]

Wynn responded on December 17, 2021, with further changes to the proposed amendment noting, "Miomni Sports will need to go through our vendor protocol."[75] Watt signed the new amendment on December 17, 2021, which was entitled, "Third Amendment and Assumption and Assignment Agreement."[76] Among other things, the agreement provided that "Miomni Gaming desires to assign all of its rights, title, duties, obligations, and interest under the Agreement to Miomni Sports, and Miomni Sports is willing to accept and assume all of Miomni Gaming's rights, title, duties, obligations, and interest under the Agreement, pursuant to the terms and conditions set forth herein…."[77] The agreement further provided that the assignment would be effective December 1, 2021. Although Watt signed the third amended Wynn agreement on behalf of both Gaming and Sports, that agreement was never signed by Wynn.[78] According to Watt, Wynn did not renew its contract with Gaming when it expired on its own terms in December 2021. Instead, Wynn simply continued to pay Gaming for its services on a rolling basis thereafter.[79]

---

[73] Sports ECF No. 34 at APEN1470-71.
[74] *Id.* at APEN1470.
[75] *Id.* at APEN1469.
[76] *Id.* at APEN1481.
[77] *Id.*
[78] Sports ECF No. 35 at APEN1673.
[79] Sports ECF No. 27 at APEN0088-0089.

On September 8, 2022, after entry of the state court decision and service of the writ of garnishment, Watt emailed Wynn asking about payment of Gaming's August 2022 invoice. In the email, he again stated, "The group have re-organised and we are trading through Miomni Sports Ltd."[80] Later that same day, Eric Aldrian, Vice President of Legal – Litigation and Compliance for Wynn emailed Watt. Aldrian explained that *Gaming's* August invoice had not been paid because Wynn had been served with a writ of garnishment directing Wynn to pay monies owed to Gaming to the sheriff's department on account of SBC's judgment.[81] Watt responded the following day, confirming the writ was valid and advising that Gaming had ceased trading while its appeal of the SBC judgment was pending.[82] Watt then stated:

> I believe your contract is with Miomni Sports Ltd, a new entity which owns the overall I.P[.] rights for it's [sic] new end-to-end platform and is licensed by NGCB.
>
> In an administrative error the August invoice was sent from Miomni Gaming Ltd.
>
> Options: I can send a credit note from Miomni Gaming Ltd and re-invoice from Miomni Sports Ltd.[83]

Aldrian responded, "I double check [sic] and it looks like our agreement is with Miomni Gaming (not Miomni Sports), do you have something showing otherwise?"[84] After a telephone call between Aldrian, Watt, Venner and Charlie Stone of Wynn, on September 13, 2022, Aldrian sent the following summary email to Watt:

> Just to recap the key points, you confirmed that Miomni Sports is licensed with NGCB and is now a WLV registered vendor, and you would like to send WLV a new licensing agreement with Miomni Sports that will not change the service or price – it's really just a structural change from an app development contract to a licensing contract. Avoiding any change or disruption in the service/app is obviously very important to WLV, which you understood. We also discussed that the contract review/approval process can take some time and that WLV should continue to pay under the prior arrangement with Miomni Gaming until a new agreement is signed. To that end, you also agreed that until WLV signs a new

---

[80] Sports ECF No. 35 at APEN1658.
[81] *Id.* at APEN1657.
[82] *Id.*at APEN1656.
[83] *Id.*
[84] *Id.*

agreement with Miomni Sports, WLV can pay amounts due to Miomni Gaming under the prior agreement to the Sheriff, in compliance with the Writ.[85]

On September 15, 2022, Watt emailed Aldrian and Douglas Castaneda at Wynn, advising that the agreement between Gaming and Wynn had expired, and attaching a new contract with Sports, pursuant to which Sports "can now offer its new online and retail platform."[86]

After months of negotiations, on December 1, 2022, Sports entered into a Licensing and Managed Service Agreement (Sports-Wynn Agreement) with Wynn.[87] Under that one-year contract Wynn licensed Sports's mobile race wagering platform. In exchange, Sports agreed to configure, set up, customize and maintain the platform for Wynn, including Apple and Android applications. The monthly license fee was $10,000. The Sports-Wynn Agreement specified, "This agreement supersedes all other agreement[s]."[88]

### 2.    South Point.

On August 23, 2022, Cyndee Hutchins, Director of Finance at South Point, emailed a copy of SBC's writ of garnishment against Gaming to Watt. She advised him that South Point would pay future Gaming invoices in compliance with the writ.[89] The next day, Watt responded with a credit note for Gaming's August 2022 invoice, asserting, "Miomni are re-organising and want to change the Southpoint [sic] contract to: Miomni Sports Ltd. A license from the NGCB is being granted."[90] Hutchins responded on August 24, 2022, declining the credit from Gaming because payment had already been issued.[91]

On August 29, 2022, Watt emailed Mary Jungers at South Point, advising that South Point's agreement with Gaming would expire on September 5, 2022, and attaching a "new contract from Miomni Sports Limited who are offering the complete end to end retail and online

---

[85] *Id.* at APEN1654.
[86] *Id.*
[87] *Id.* at APEN1740-1764.
[88] *Id.* at APEN1741.
[89] Sports ECF No. 34 at APEN1584.
[90] *Id.*
[91] *Id.*

race and sports platform."[92] On September 15, 2022, South Point signed a Managed Service Agreement (Sports-South Point Agreement) with Sports.[93] The agreement was effective September 6, 2022.[94] Under that one-year contract, South Point licensed Sports's mobile race wagering platform, and Sports agreed to configure, set up, customize and maintain the platform for South Point, including Apple and Android applications. The monthly license fee was $4,000, with an additional $1,500 for video streaming. The Sports-South Point Agreement specified, "This agreement supersedes all other agreement[s]."[95]

### 3.    Atlantis.

On September 9, 2022, Steve Mikkelson of Atlantis emailed Venner, following up on a meeting he had with Venner the prior week. In his email, Mikkelson requested a timeline and draft contract for a mobile application and a field trial for both Nevada and a related property in Colorado.[96] Venner submitted a contract to Mikkelson on September 19, 2022 "from Miomni Sports who have the end to end platform."[97] Venner later clarified the parameters for the proposed deal, stating it was for "mobile sports and race Nevada and mobile sports Colorado. Basically, plugging our system into the Stadium back office and swapping out the stadium mobile apps."[98]

On October 1, 2022, Mikkelson prompted Venner for an invoice for Atlantis's race mobile app.[99] Venner responded,[100] "[a]s Miomni Sports is the entity that has the full end to end platform it probably makes sense to wait until the new deal is agreed."[101] On October 28, 2022,

---

[92] Sports ECF No. 35 at APEN1614.
[93] *Id.* at APEN1621-1641.
[94] *Id.* at APEN1624.
[95] *Id.* at APEN1622.
[96] Sports ECF No. 35 at APEN1786.
[97] *Id.* at APEN1785.
[98] *Id.* at APEN1783.
[99] *Id.*
[100] The email address used for this communication was mike.venner@miomni.com. As early as October 29, 2022, Venner was included in emails at the mike.venner@miomnisports.com email address. Sports ECF No. 37 at APEN2142-43.
[101] *Id.*

Sharn Christopher of Miomni[102] emailed Mikkelson seeking an update regarding the status of the Sports contract.[103] Mikkelson responded on November 7, 2022, asking for a full service proposal from Sports incorporating mobile and retail operations in Nevada and Colorado.[104] Christopher responded the same day, promising a full proposal but seeking sign off on the mobile contract with Sports: "We need to get the contract agreed with Miomni Sports as it is Miomni Sports that is now licensed to offer the services in Nevada. NGCB therefore needs Miomni Sports to contract with [Atlantis]." *Id.* When Mikkelson continued to request a full proposal prior to signing an agreement with Sports, Christopher informed him on November 22, 2022, that "we cannot continue to support the Race app without a contract in place with Miomni Sports…. We are obliged under NGCB to ensure that all customers are on the Miomni Sports contracts and so we need this agreed and in place before the end of this month. We are unable to support a product without the correct contract in place."[105]

After they spoke over the telephone, Christopher sent Mikkelson a contract with Sports on December 9, 2022.[106] In response, Mikkelson expressed confusion: "Is this a new contract for [M]arch 17, 2023 going forward? Or is this a contract to replace what we currently have in place? If it's to replace and just change the contract to reflect Miomni Sports, why the increase in fees to $4,500 per month?"[107] Christopher explained: "It has to replace the existing contract as Miomni Gaming has ceased trading and Miomni Sports is a different company."[108]

---

[102] The email address used for this communication was sharn.christopher@miomnisports.com. Prior emails from Christopher were sent using the email address sharn.christopher@miomni.com. *See, e.g.,* Sports ECF No. 34 at APEN1460. Additionally, Christopher's email signature block listed Miomni's head office location at Edge House, 42 Bond Street, Brighton, BNI 1RD. This is in contrast to her prior email signature block, which listed Miomni's head office location at 6th Floor, Queensberry House, 106 Queens Road, Brighton, BN1 3XF, as well as an address for Gaming at 4310 Cameron Street, Suite 13, Las Vegas, NV 89103. *Id.*
[103] *Id.* at APEN1795.
[104] *Id.* at APEN1794.
[105] *Id.* at APEN1791.
[106] *Id.* at APEN1788.
[107] *Id.* at APEN1787.
[108] *Id.*

On January 18, 2023, after Mikkelson offered to execute a one-page name change agreement in lieu of a new contract, Christopher reiterated:

> We cannot change the name only as the company is no longer in existence, therefore the contract is terminated. Miomni Sports is a separate business and as such has its own contracts. If we cannot get a new contract in place with Miomni Sports, unfortunately we will have to cease the service. We cannot continue to run the service as we now have no contract in place.[109]

Five days later, Christopher informed Mikkelson that the service would be terminated on January 27, 2023, if no new contract was executed. She stated, "we can no longer run the service without a contract in place."[110] Atlantis was granted a one-week extension to finalize the contract with Sports.[111]

On February 6, 2023, Sports entered into a Licensing and Managed Service Agreement (Sports-Atlantis Agreement) with Atlantis.[112] The effective date of the Sports-Atlantis Agreement was October 1, 2022.[113] Under that two-year contract, Atlantis licensed Sports's mobile race wagering platform, and Sports agreed to configure, set up, customize and maintain the platform for Atlantis, including Apple and Android applications. The monthly license fee was $4,500. The Sports-Atlantis Agreement also specified, "This agreement supersedes all other agreement[s]."[114]

### 4.    Stations.

On September 6, 2022, Watt emailed Jason McCormick at Stations, attaching a "new contract to take you to the end of August 2023…with Miomni Sports Ltd who have all the rights required to offer you the licensed platform."[115] Additionally, on September 20, 2022, Kerry

---

[109] Sports ECF No. 37 at APEN2131.
[110] *Id.* at APEN2130.
[111] *Id.* at APEN2127-28.
[112] Sports ECF No. 35 at APEN1797-1817.
[113] *Id.* at APEN1814.
[114] *Id.* at APEN1798.
[115] Sports ECF No. 37 at APEN2096.

Venner[116] emailed Jason Simbal and others at Stations, informing them that "Miomni Gaming will no longer be the licensed entity. Miomni Sports is now the entity that owns the end-to-end platform license for Nevada."[117] Simbal responded, "[W]hy the entity name change?" The next day, Kerry Venner explained:

> It is not a name change. Miomni Sports Ltd. is a different registered business which has the rights for the new end to end platform (retail and online race and sports) which we are launching in Nevada next year.

> This business also has the rights to the online platform which is being approved by [GLI]. Miomni Sports is approved by NGCB. Miomni [G]aming is an app development business and is not a technology licensing business.[118]

Over a month after Watt's first contact with Stations, McCormick requested revisions, which Watt promptly sent.[119] A week later, on October 19, 2022, Watt emailed[120] McCormick again, asking, "[c]ould I have a contact in your legal department as NGCB have requested all our customers must be contracted by Miomni Sports as Miomni [G]aming is surrendering its licenses."[121] On November 1, 2022, Watt emailed McCormick a letter on Gaming letterhead addressed to Stations, which read, "Please find this letter of confirmation that MIOMNI GAMING LIMITED has ceased trading on 1st September 2022. The NGCB have been informed and MIOMNI GAMING LIMITED license is due to lapse."[122]

Over the course of the next month, Stations continued to express to Watt various concerns related to the contract.[123] Executive Vice President and Chief Legal Officer Jeffrey Welch inquired, "We get that we need to work with Miomni Sports and are happy to do so, but

---

[116] Kerry Venner's email address concluded with "miomni.com," and his email signature block identified him as the creative project manager for Miomni, with no specification as to Holdings, Gaming, Sports or another Miomni entity. Exhibit 189 (under seal) at APEN2062.

[117] *Id.*

[118] *Id.* at APEN2061.

[119] Sports ECF No. 37 at APEN2095.

[120] As of October 18, 2022, Watt was using his "miomni.com" email address. *Id.* As early as October 31, 2022, however, Watt communicated with Welch using an email from "miomnisports.com." *Id.* at APEN2097.

[121] *Id.*

[122] *Id.* at APEN2097-98 [emphasis omitted].

[123] Exhibit 190 (under seal) at APEN 2066-71.

are also wondering why you started with a totally separate form of agreement. Can we just adapt the existing agreement to continue the old deal with the new entity?"[124] On November 9, 2022, Watt responded, "The existing agreement is with Miomni Gaming which has ceased trading. The contract we sent is with the new entity Miomni Sports. You could amend that, though it offer[s] more services than you require, but don't need to subscribe to them."[125] The following day, Watt elaborated: "[J]ust to clarify, Miomni Sports Ltd. cannot sign up to another companies [sic] contract. Miomni Sports Ltd is a different entity that offer [sic] other services and as such has its own contracts and T&C's, which Miomni Sports Ltd [sic] other customers are signed up to."[126] After several email exchanges, on November 28, 2022, Welch reported that Stations was "contacted by the judgment creditor for the dissolved Miomni entity."[127] He advised that Stations was going to make "some additional tweaks to the agreement to try to minimize the financial risk to us from the situation."[128]

The Licensing and Managed Service Agreement between Sports and Stations (Sports-Stations Agreement) was signed by Welch on November 29, 2022, effective September 1, 2022.[129] Under that one-year contract, Stations licensed Sports's mobile race and sports wagering platform, and Sports agreed to configure, customize and maintain the platform for Stations, including Apple and Android applications. The monthly license fee was $57,000.[130] The Sports-Stations Agreement again specified, "This agreement supersedes all other agreements by and between Miomni and [Stations]."[131]

---

[124] *Id.* at APEN2070.
[125] *Id.*
[126] *Id.*
[127] *Id.* at APEN2067.
[128] *Id.*
[129] Exhibit 191 (under seal) at APEN2073-94.
[130] *Id.* at APEN2090.
[131] *Id.* at APEN2073.

### J.    Gaming Files for Bankruptcy in the United States.

On November 30, 2022, Gaming filed a voluntary chapter 7 bankruptcy petition in Nevada, commencing case no. 22-14240 (Main Case). In its petition, it listed its principal place of business as 3773 Howard Hughes Parkway, Suite 500S, Las Vegas, NV 89169.[132] It also listed www.miomni.com as its website, noting "website used by other non-filing companies too."[133] Its estimated assets were valued between $0 to $50,000, and its liabilities estimated at $1,000,0001 to $10 million.[134] The petition was signed by Watt as manager of Gaming.[135] Attached to the petition was the "Certificate of Resolutions of Miomni Gaming Limited (Company No. 7730346)," reflecting a meeting of Gaming's management held on November 30, 2022, at which they decided to place Gaming into a chapter 7 bankruptcy.[136] The certificate was signed by Venner and Watt as directors of Gaming, and was dated November 30, 2022.[137]

On January 11, 2023, Gaming filed the remainder of its case commencement documents. The debtor listed just over $125,000 in assets, and over $9.6 million in liabilities.[138] Its only two assets were the 2020 judgment entered in its favor in its United Kingdom litigation against EnterG, valued at $125,000, and $36.50 in a checking account.[139] Gaming did not list any intellectual property in its schedule A/B.[140] SBC was listed as a general unsecured creditor holding a disputed claim of over $6.5 million.[141] In schedule G, Gaming listed its agreements with South Point, Stations and Wynn, as well as the Holdings-Gaming License.[142] All of the agreements were described as terminated.[143]

---

[132] Main Case ECF No. 1 at 1.
[133] *Id.*
[134] *Id.* at 3.
[135] *Id.* at 5.
[136] *Id.* at 6.
[137] *Id.*
[138] Sports ECF No. 27 at APEN0130.
[139] *Id.* at APEN0131, APEN0133.
[140] *Id.* at APEN0132-33.
[141] *Id.* at APEN0138.
[142] *Id.* at APEN0140-41.
[143] *Id.*

Confusingly, in response to item 5 of the Statement of Financial Affairs addressing "repossessions, foreclosures and returns," Gaming listed the Holdings-Gaming License as property that was "obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller."[144] The creditor listed was Sports, not Holdings, though the property description stated, "Termination of License Agreement dated 11/28/14 due to insolvency; MHL was licensor and MGL was licensee…."[145]

**K.    SBC Commences Adversary Proceeding.**

On December 23, 2022, SBC filed its original complaint to commence the instant adversary case against Holdings, Sports, Miomni Limited, and Gaming.[146] The complaint asserted causes of action for intentional and constructive fraudulent transfers of the Atlantis, South Point, Stations, and Wynn agreements with Gaming, as well as the Miomni Systems. SBC also sought successor and alter ego liability against Sports.

Concurrently with the original complaint, SBC filed an emergency motion seeking injunctive relief and relief from the automatic stay, asserting that Gaming's assets – namely, its contracts with the casinos and its alleged intellectual property – were transferred to Sports in an effort to avoid SBC's judgment.[147] Among other things, SBC sought "[a] narrow asset freeze of all current bank accounts, all future profits and accounts receivable obtained, and a full and complete accounting of" all defendants.[148] The emergency motion was opposed by Gaming, which argued SBC lacked standing to bring its claims.[149] Similarly, the chapter 7 trustee opposed the injunctive relief, asserting that SBC's alter ego claims belonged to the estate, not its creditors.[150] On January 25, 2023, the court entered its order denying SBC's emergency motion,

---

[144] *Id.* at APEN0144.
[145] *Id.*
[146] Adv. ECF No. 1.
[147] Adv. ECF No. 3.
[148] *Id.* at 18.
[149] Adv. ECF No. 17.
[150] Adv. ECF No. 18 at 6:27-7:2.

concluding among other things that both the fraudulent transfer and alter ego claims were property of the estate, and SBC lacked standing to pursue them.[151]

**L.      Trustee Sells the Estate's Claims to SBC.**

The next day, on January 26, 2023, the chapter 7 trustee filed a Motion to Sell Causes of Action Free and Clear of All Claims, Encumbrances, and Interests (Motion to Sell).[152] The trustee proposed to sell to SBC the bankruptcy estate's interests in certain avoidance and alter ego causes of action against Holdings, Sports, Gaming, and Limited. The Motion to Sell was heard in Gaming's bankruptcy case on shortened time, and was granted as unopposed on February 8, 2023.[153]

**M.      SBC Seeks Entry of Default.**

Also on February 8, 2023, SBC filed its Three-Day Notice of Intent to Take Default in the adversary proceeding for the failure to answer or file a responsive pleading as to all defendants except Gaming.[154] Seven days later, on February 15, 2023, SBC dismissed Gaming from the adversary.[155]

The next day, on February 16, 2023, Sports filed a motion to dismiss the adversary, asserting SBC lacked standing to bring its claims (Sports Motion to Dismiss).[156] On February 17, 2023, SBC renewed its emergency motion for injunctive relief, seeking consideration on shortened time, which Sports opposed.[157] The court set both the emergency motion and the Sports Motion to Dismiss for hearing on March 29, 2023.[158]

On February 23, 2023, SBC filed its request for entry of default in the adversary proceeding only as to defendants Limited and Holdings.[159] The same day, Sports filed a

---

[151] Adv. ECF No. 27 at 7:10-18.
[152] Main Case ECF No. 24.
[153] Main Case ECF Nos. 34, 83 (transcript).
[154] Adv. ECF No. 30.
[155] Adv. ECF No. 32.
[156] Adv. ECF No. 34.
[157] Adv. ECF Nos. 35, 40.
[158] Adv. ECF Nos. 42, 66.
[159] Adv. ECF No. 45.

document entitled "Miomni Sports, Ltd.'s Response to Request for Entry of Default Against Miomni Holdings Co. and Miomni Ltd. Under Local Bankruptcy Rule 7055."[160] In the document, Sports advised that Holdings and Limited intended to defend the action and had advised counsel for SBC of their intent, but were waiting to see if the court granted the Sports Motion to Dismiss.[161] Sports also "advised" that Holdings and Limited would object to personal jurisdiction and would "respond to the…Complaint…pending a determination of the Complaint as to the appropriateness and validity of its claims."[162]

The next day, on February 24, 2023, the Clerk of Court entered default against Holdings and Limited.[163] Five days later, on February 28, 2023, defendants Limited and Holdings filed their motion to "Set Aside Defaults and Motion to Dismiss Adversary Complaint" as to Holdings (Motion to Dismiss).[164] Holdings again designated a special appearance "without consenting to nor waiving personal jurisdiction."[165] In the Motion to Dismiss the defendants argued that SBC lacked standing to bring the claims against Holdings, and lacked personal jurisdiction over Holdings. Also on February 28, 2023, Holdings and Limited filed their "Motion for Stay of Proceeding Related to Defaults," seeking an order staying the adversary proceeding pending the outcome of the Motion to Dismiss.[166] The motion to stay was set for March 29, 2023; the Motion to Dismiss was set for hearing on April 12, 2023.[167]

On July 11, 2023, the court entered its orders denying the motion to stay[168] but granting the Sports Motion to Dismiss, with leave to amend.[169] Holdings' and Limited's Motion to Dismiss was denied as to dismissal, but granted insofar as it requested default be vacated.[170]

---

[160] Adv. ECF No. 47.
[161] *Id.* at 2:6-9.
[162] *Id.* at 10-13.
[163] Adv. ECF No. 48.
[164] Adv. ECF No. 53.
[165] Adv. ECF No 53 at 2:3-4.
[166] Adv. ECF No. 55.
[167] Adv. ECF Nos. 54, 65.
[168] Adv. ECF No. 87.
[169] Adv. ECF No. 90.
[170] Adv. ECF No. 92.

SBC filed its first amended complaint on July 12, 2023.[171] The first amended complaint was met with an answer filed by Sports and Limited,[172] and another motion to dismiss filed by Holdings for lack of personal jurisdiction.[173] Prior to the court's ruling on the Holdings motion to dismiss, SBC filed a motion to file a second amended complaint.[174] The court granted Holdings' motion to dismiss on February 5, 2024.[175] SBC's motion to file its second amended complaint was granted on February 20, 2024.[176]

Meanwhile, on February 14, 2024, counsel for Sports and Limited, A.J. Kung, filed her motion to withdraw as counsel of record.[177] Describing irreconcilable differences, Kung revealed that Sports and Limited were "unable to fulfill [their] financial obligations" and that Sports had commenced its own liquidation proceedings in the United Kingdom.[178] The motion to withdraw was granted on March 13, 2024.[179]

On March 1, 2024, SBC filed its verified second amended complaint[180] against Holdings, Sports, Limited, Watt, Venner and Konstam, accompanied by six volumes of exhibits.[181] When the court issued summonses without Holdings listed as a defendant, SBC moved to add Holdings to the summons.[182] The court denied the request, requiring SBC to file a revised second amended complaint removing Holdings as a defendant.[183] Further, the court ruled that if SBC sought to add Holdings as a defendant after its motion to dismiss had been granted, SBC needed to file a motion to further amend its complaint.[184]

---

[171] Adv. ECF No. 96.
[172] Adv. ECF No. 116.
[173] Adv. ECF No. 119.
[174] Adv. ECF No. 156.
[175] Adv. ECF No. 212.
[176] Adv. ECF No. 226.
[177] Adv. ECF No. 215.
[178] *Id.* at 2-8.
[179] Adv. ECF No. 265.
[180] Adv. ECF No. 240.
[181] Adv. ECF Nos. 241-46.
[182] Adv. ECF No. 258.
[183] Adv. ECF No. 274.
[184] *Id.*

SBC filed its motion for leave to file the Third Amended Complaint (Complaint) on March 27, 2024.[185] Kung filed an opposition to the motion, acting this time as counsel for Holdings.[186] In support of Holdings' opposition, Kung further filed five volumes of exhibits designated as "Miomni Master Appendix."[187] Further, before the May 7, 2024 hearing on Sports's motion for leave to file the Complaint, on behalf of the liquidators appointed to Sports's United Kingdom liquidation proceeding, Kung filed a notice of Sports's chapter 15 proceeding, case no. 24-11963-gs.[188]

On May 15, 2024, the court entered its order granting SBC's motion for leave to file its third amended complaint.[189] Two days later, SBC filed the Complaint.

The same day, on May 17, 2024, SBC filed its first motion for partial summary judgment against Sports,[190] supported by eleven volumes of exhibits.[191] The court set the matter for a status hearing, stating its concerns regarding the impact of the relief requested on Sports's chapter 15 proceedings.[192] Thereafter, on June 7, 2024, SBC filed its motion to disqualify Kung's law firm from representing any party to the proceeding, including the United Kingdom liquidators.[193] The court then vacated the status conference on the initial summary judgment motion, pending the selection of a hearing date when the parties' counsel could appear in person.[194]

---

[185] Adv. ECF No. 279.
[186] Adv. ECF No. 301.
[187] Adv. ECF Nos. 307-11.
[188] Adv. ECF No. 297.
[189] Adv. ECF No. 344.
[190] Adv. ECF No. 352.
[191] Adv. ECF Nos. 354-64.
[192] Adv. ECF No. 370. Subsequently, on October 15, 2024, the court entered its order in Sports's chapter 15 case terminating the automatic stay to allow SBC to proceed to liquidate its claims against Sports. Sports ECF No. 86.
[193] Adv. ECF No. 374.
[194] Adv. ECF No. 384.

The court held its hearing on the disqualification motion and the status conference on summary judgment on August 27, 2024. After supplemental briefing was filed by the parties, the motion to disqualify was denied.[195]

On October 18, 2024, SBC filed the Motion. No opposition was filed. The court heard oral argument on December 10, 2024, and supplemental briefing was filed later that same day.[196] On receipt of the supplemental briefing, the court took this matter under advisement.

## Analysis

SBC seeks entry of an order granting "partial summary judgment against Sports on its first, second, third, fifth, sixth, and eighth claims for relief set forth in its Third Verified Complaint."[197] The first, second, and eighth claims state causes of action for actual and constructive fraudulent transfers under § 548(a) and Nevada state law. The third cause of action seeks to impose successor liability on Sports as a mere continuation of Gaming. Similarly, the fifth cause of action seeks to hold Sports liable for Gaming's debts as its alter ego. In the sixth cause of action, SBC seeks a declaratory judgment that the Holdings-Gaming License is not authentic and is unenforceable. SBC's claims are largely premised on its argument that Gaming owns the "Miomni Systems" which were used to create the mobile gaming applications for Wynn, Stations, South Point, and Atlantis. Because they believe the intellectual property and computer programs belong to Gaming, SBC further reasons that the contracts with these casinos were also property of the debtor.

Sports actively defended the claims against it in the early stages of the litigation. However, since its insolvency proceeding in the United Kingdom and an ancillary chapter 15 proceeding in Nevada, it has not participated in the adversary proceeding or opposed the Motion.[198] While the court granted relief from the automatic stay to permit SBC to liquidate the

---

[195] Adv. ECF No. 426.
[196] Adv. ECF No. 436.
[197] Adv. ECF No. 418 at 10:26-28.
[198] Case No. 24-11963-gs.

Gaming estate's claims against Sports, enforcement of any claim remains subject to the insolvency proceedings.

## I.  Summary Judgment Standards.

Fed. R. Civ. P. 56, incorporated by Fed. R. Bankr. P. 7056, governs motions for summary judgment. Under Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[199] A fact is "material" if it may affect the outcome of the case under the pertinent substantive law.[200] "An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."[201]

Here, SBC is the plaintiff and bears the burden of proof on its claims at trial. On summary judgment, it similarly bears an initial burden to "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[202] SBC, as the moving party, "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[203] If the moving party carries its initial burden of production, the non-moving party must produce sufficient evidence to demonstrate that a genuine issue of material fact exists to defeat summary judgment.[204] However, "[i]f a moving party fails to carry its initial burden, the nonmoving party has no obligation to produce anything, even if the

---

[199] Fed. R. Civ. P. 56(a).

[200] *Anderson v. Liberty Lobby, Inc., et al.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[201] *Far Out Productions, Inc. v. Oskar, et al.*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-249).

[202] *The Litigation Trust of the Rhodes Companies, LLC v. James M. Rhodes (In re Rhodes Companies, LLC)*, 2013 WL 5785291, at *2 (Bankr. D. Nev. July 1, 2013), *report and recommendation adopted*, 2013 WL 7020748 (D. Nev. Dec. 27, 2013) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)).

[203] *Id.*

[204] *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Tucson Electric Power Co. v. Pauwels Canada Inc.*, 651 Fed. Appx. 681, 682 (9th Cir. 2016).

nonmoving party would have the ultimate burden of proof at trial."[205] Because it is SBC's affirmative burden to demonstrate that there is no genuine dispute of material fact precluding summary judgment, "'[e]ven when faced with an unopposed motion for summary judgment,' courts 'cannot grant [such] a motion ... without first considering supporting evidence and determining whether the movant has met its burden.'"[206]

Although Sports has not opposed the Motion, the court must examine the arguments and evidence presented to determine whether entry of partial summary judgment is appropriate. SBC must still demonstrate there is no genuine issue of disputed material fact on its claims to obtain summary judgment.[207] Though unopposed, it also bears repeating that the court must construe all reasonable inferences in favor of Sports on summary judgment.[208] Therefore, "all facts genuinely in dispute" must be viewed, and all reasonable inferences must be made, "in the light most favorable to the nonmoving party."[209]

## II. Summary judgment must be denied on SBC's claims for fraudulent transfer because it has failed to establish that Gaming transferred an interest in its property to Sports.

SBC asserts claims for actual and constructive fraudulent transfer against Sports under § 548(a) of the Bankruptcy Code and Nevada law. To establish a fraudulent transfer SBC must prove that Gaming transferred an interest in its property to Sports within the applicable

---

[205] *Rhodes Companies,* 2013 WL 5785291 at *2.

[206] *First Merchants Bank v. Johnson (In re Johnson)*, 662 B.R. 635, 646 (Bankr. S.D. Ohio 2024) (quoting *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013)) [citing cases]; *see also Northstar Offshore Grp., LLC v. Acadiana Coating & Supply, Inc. (In re Northstar Offshore Grp., LLC),* 2024 WL 4177957, at *2 (Bankr. S.D. Tex. Sept. 12, 2024) ("Despite the fact that it is unopposed, the Court has a duty to review the record to determine whether the [summary judgment] motion should be granted."); *Ohai v. Delta Comm. Credit Union (In re Ohai)*, 2024 WL 1100025, at *2 (Bankr. N.D. Ga. Mar. 13, 2024) ("[T]he fact that an argument remains essentially unopposed does not relieve the Court of the duty to determine whether summary judgment is appropriate.").

[207] Fed. R. Civ. P. 56(a).

[208] *See Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 462 (B.A.P. 9th Cir. 2015) (citing *Fresno Motors, LLC v. Mercedes Benz USA, LLC,* 771 F.3d 1119, 1125 (9th Cir. 2014)).

[209] *Joudeh v. Truppa (In re Truppa)*, 2017 WL 1533381, at *4 (B.A.P. 9th Cir. Apr. 27, 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Plyam*, 530 B.R. at 462 (citing *Fresno Motors,* 771 F.3d at 1125).

reachback period with either "actual intent to hinder, delay or defraud a present or future creditor," or for less than reasonably equivalent value while insolvent (or one of the other statutory requirements found in § 548(a)(1)(B)).[210] The elements of fraudulent transfer under Nevada law are effectively the same.[211] The plaintiff seeking to avoid actual fraudulent transfers under § 548(a)(1)(A) bears the burden of proving all the statutory elements by clear and convincing evidence.[212] The plaintiff asserting a constructive fraudulent transfer under § 548(a)(1)(B) bears the burden of proving all the statutory elements by a preponderance of the evidence.[213]

Under either theory of fraudulent transfers, SBC must establish that Gaming transferred an interest in its property to Sports prepetition. There is no fraudulent transfer absent the debtor's transfer of its property to a third party.[214] "The term 'transfer' is defined by the Bankruptcy Code to include 'each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with property or an interest in property.'"[215] SBC alleges that Gaming fraudulently transferred the following assets to Sports: the Miomni Systems; Gaming's employees; and Gaming's contracts with the Nevada casinos as well as payments owed under those contracts.[216] SBC's claims on summary judgment suffer from a lack of specificity. The claims for actual fraudulent intent fall under the requirements of Fed. R. Civ. P. 9(b), which

---

[210] 11 U.S.C. § 548(a)(1)(A) and (B); N.R.S. 112.180(1)(a); *see also Leonard v. Coolidge, et al. (In re Nat'l Audit Defense Network)*, 367 B.R. 207, 218-19 (Bankr. D. Nev. 2007).

[211] *Castaldi v. Schwartzer (In re Welscorp, Inc.)*, 2023 WL 4635886, at *6 (B.A.P. 9th Cir. July 20, 2023); N.R.S. 112.180(1)(a) and (b).

[212] *Linco Inc. v. Beauty Memory (In re Eachpole, Inc.)*, 2025 WL 351823, at *121 (Bankr. D. Nev. Jan. 24, 2025) (citing *Pacific Links U.S. Holdings, Inc. v. Tianjin Dinghui Hongjun Equity Investment Partnership (In re Pacific Links U.S. Holdings, Inc.)*, 644 B.R. 197, 208 (Bankr. D. Hawai'i 2022)).

[213] *Eachpole*, 2025 WL 351823 at *56 (quoting *Rainsdon v. Garcia (In re Garcia)*, 465 B.R. 181, 190–91 (Bankr. D. Idaho 2011)).

[214] *See McCord v. Ally Financial, Inc. (In re USA United Fleet, Inc.)*, 559 B.R. 41, 59 (Bankr. E.D.N.Y. 2016) ("[T]he debtor must have had an interest in the property alleged to be fraudulently transferred.").

[215] *Id.* at *56.

[216] Adv. ECF No. 418 at 17:5-7.

requires a plaintiff to plead the "who, what, when, where, and how" of the fraudulent transfers.[217] However, Rule 9(b) does not apply to the pleading of claims for constructive fraudulent transfer.[218]

Ultimately, SBC must prove how and when Gaming fraudulently transferred the Miomni Systems, its employees, and the casino contracts to Sports. SBC has loosely attempted to do so. Having considered SBC's Motion at length, the court understands that SBC argues that Gaming owned the Miomni Systems and transferred its technology, employees, and casino contracts sometime around or after entry of SBC's judgment against Gaming in the Nevada state court. For the reasons explained below, the court holds that SBC has failed to prove the absence of any genuine dispute that: (1) Gaming owned the Miomni Systems, or held any rights in that technology on the date of any transfer to Sports; (2) Gaming, as opposed to Holdings, transferred any interest in the Miomni Systems or the casino contracts; and (3) Gaming transferred any employees to Sports. Because each of these material facts remains subject to a genuine dispute, summary judgment must be denied.

A.    **The Miomni Systems.**

SBC primarily focuses on Gaming's fraudulent transfer of the Miomni Systems. SBC defines the Miomni Systems as:

> The Miomni Systems, and as defined within Miomni's contracts means and includes the entire solution provided by or through the Debtor, including, without limitation, middleware, back-end services, content management services, content delivery systems, and geolocation services owned, operated by or licensed by the Debtor. Exhibit 11 (2015 Debtor-Wynn Contract); Exhibit 13 (2016 Debtor-South Point Contract); Exhibit 14 (2017 Debtor-Atlantis Contract); Exhibit 183 (2016 Debtor-Stations Contract).[219]

In short, the Miomni Systems was the technology used to create the applications Gaming provided to the casinos under its contracts.

---

[217] *See Takiguchi v. MRI Int'l, Inc.,* 2015 WL 1609828, at *2 (D. Nev. Apr. 10, 2015).
[218] *Id.*
[219] Adv. ECF No. 418 at 9, n.3.

**1. SBC fails to establish that Gaming owned the Miomni Systems.**

SBC argues that Gaming owned the programming and all resulting applications that comprise the Miomni Systems. It contends that Gaming fraudulently conveyed the programming and applications to Sports.

Gaming acquired its interest in the Miomni Systems under the Holdings-Gaming License, executed by the parties on November 18, 2014.[220] In that agreement Holdings granted Gaming a "non-exclusive, non-transferable License" to the Miomni Systems.[221] The "Approved Purpose" of the Holdings-Gaming License was described as "[s]ublicensing object code and the modification of source code."[222] The Holdings-Gaming License was also clear that: "Any modification of source code or object code automatically becomes the Intellectual Property of the Licensor."[223] It further expressly provided that, "[a]ll Intellectual Property Rights over and in respect of the Asset are owned by Licensor. ***The Licensee does not acquire any rights of ownership in the Asset.***"[224] As discussed above, Gaming actively used and modified the Holdings-Gaming License to operate the mobile sports betting applications it licensed to the casinos.

Taken at face value, Gaming never owned the Miomni Systems under the Holdings-Gaming License. Nor did Gaming own the applications it developed for the casinos. The intellectual property, including the applications, was owned by Holdings. Rather, Gaming held a license to use and develop the intellectual property comprising the Miomni Systems. Holdings terminated that license as of August 31, 2022. Construing the facts in the record in favor of Sports, Gaming held non-exclusive interests in the Miomni Systems until August 31, 2022.

---

[220] Sports ECF No. 32 at APEN1345.
[221] *Id.* at APEN1352. The Holdings-Gaming License defines "Asset" under Item 6 of the attached schedule as "[t]he Miomni technology, i.e. middleware platform geo-location technology and mobile application for sports betting." *Id.*
[222] *Id.*
[223] *Id.*
[224] *Id.* at APEN1347 [emphasis added].

31

2.       **The alleged transfer of the Miomni Systems to Sports.**

Having established that Gaming held a non-exclusive right to use and develop the Miomni Systems under the Holdings-Gaming License, the question becomes when did Gaming allegedly transfer the Miomni Systems to Sports? Unfortunately, nowhere in its summary judgment motion does SBC say when, or how, that transfer occurred. SBC's Motion is bereft of *any* discussion of how or when Gaming transferred the Miomni Systems to Sports, much less any direct evidence of a transfer from Gaming. The only reference to the timing of the alleged transfer is found in SBC's Complaint. There, SBC alleged generally that Gaming transferred the Miomni Systems "and other assets to Sports, Holdings, and/or Limited sometime after March 15, 2022."[225] This is unhelpful. The lack of any evidence of the actual transfer of the Miomni Systems from Gaming to Sports, and the actual date of that transfer, precludes entry of summary judgment.

Reviewing the volumes of exhibits presented, the only relevant evidence establishes that Holdings, not Gaming, granted a non-exclusive license to use the Miomni Systems to Miomni Media Limited, which became Sports. The Holdings-Sports License is dated December 2019.[226] At the very minimum, the existence of the Holdings-Sports License creates a genuine issue as to who transferred the Miomni Systems to Sports and when they were transferred. If accepted, *Holdings'* transfer of the Miomni Systems would preclude SBC's claims that *Gaming* fraudulently transferred the technology to Sports at some undefined point in 2022.

Even if the court were to ignore the evidence of the Holdings-Sports License, SBC still has failed to explain how Gaming transferred the Miomni Systems to Sports. This creates another issue of fact. Until August 31, 2022, Gaming held non-exclusive rights to use the Miomni Systems under its Holdings-Gaming License. And the record is clear that Gaming was using the Miomni Systems to perform under its contracts with the casinos until that date.

---

[225] Adv. ECF No. 349 at 51, ¶ 229. SBC also alleged that the challenged transfers occurred within two years of the bankruptcy filing. *Id*. at 62, ¶ 302; 73, ¶ 401.
[226] Sports ECF No. 34 at APEN1353-1368.

Moreover, the evidence shows that Gaming was billing the casinos under its contracts and being paid on those contracts, though subject to SBC's writ of garnishment as of August and September 2022. Prior to August 31, 2022, Gaming could have transferred its licensing rights to Sports – though by that time Sports already held a license for the same rights. Holdings terminated Gaming's license to use the Miomni Systems on August 31, 2022. After that date Gaming held *no* rights in the technology to transfer to Sports according to the termination notice.

SBC never directly addresses the separate licensing agreements between Holdings and Gaming, and Holdings and Sports. Nor does it directly address Holdings' termination of Gaming's license. Instead, SBC simply argues that all the actions were part of a fraudulent scheme because Gaming stopped billing the casinos sometime after the state court judgment, and Sports ultimately obtained contracts with the casinos that had previously contracted with Gaming. These actions may or may not be actionable, but SBC has failed to establish the absence of any genuine doubt that Gaming transferred the Miomni Systems to Sports at a time when it held rights to that technology or owned it.

### 3.    SBC's arguments regarding ownership of the Miomni Systems.

SBC's Motion largely *assumes* that Gaming owned the Miomni Systems. SBC first discusses the Holdings-Gaming License, at page 32 of 36 of its Motion after completing its analysis of the fraudulent transfer claims. It refers to the license as the "Debtor-Holdings Promise."[227] Whatever SBC's intent may have been in calling the license a "promise," it does not negate the inference that necessarily arises from that document and Holdings' termination of the license: Holdings granted Gaming a license to use property of Holdings, and Holdings terminated that license on August 31, 2022. Given these documents, the court must construe the facts in favor of Sports.[228]

SBC never refutes the nature and substance of the Holdings-Gaming License, or Holdings' termination of the license. Rather, it argues that the Holdings-Gaming License is an

---

[227] Adv. ECF No. 349 at 5, ¶ 14.
[228] *Plyam*, 530 B.R. at 462 (citing *Fresno Motors,* 771 F.3d at 1125).

unenforceable fraudulent contract due to lack of consideration.[229] The significance of this argument is lost on the court if Holdings owned the underlying technology at the outset of that arrangement. SBC also argues that the parties are judicially estopped from denying Gaming's ownership of the Miomni Systems despite the clear language of the Holdings-Gaming License.

### a. Unenforceable Contract.

SBC contends that the Holdings-Gaming License is unenforceable in an attempt to establish *Gaming's ownership* of that technology.[230] Yet, Holdings entered the Holdings-Gaming License as the owner of the technology; it granted Gaming the license to use it. Even if the court were to accept that though Gaming used Holdings' technology for eight years the license was unenforceable, the technology would remain with Holdings as its original owner. SBC fails to offer any explanation why Gaming may convert technology originally belonging to Holdings under any theory.

Moreover, SBC asks the court to review the Holdings-Gaming License, created in 2014 under British law, and declare Gaming the owner of the Miomni Systems based on a failure of consideration under Nevada law. Gaming and Holdings are entities registered under the laws of the United Kingdom. Moreover, the Holdings-Gaming License also includes a choice of law provision that the License shall be "governed in accordance with the laws of England."[231] Yet, SBC offers no discussion, much less an analysis, of the applicable choice of law. SBC simply applies Nevada law to a contract between two foreign entities without offering any analysis as to

---

[229] SBC's attempt to simply recast the Holdings-Gaming License is even more troubling as it provides no discussion, reasoning, or authority for attempting to dismiss it merely as a "promise." Nor is there any recognition that the transaction involved two British entities, suggesting that British law would control any treatment of that agreement.
[230] In its eighth cause of action, SBC asks the court to declare that the Holdings-Gaming License and the Holdings-Sports License are unenforceable under Nevada law. Adv. ECF No. 349 at 77, ¶¶ 10-11. The court notes that in the Complaint, SBC only seeks this declaratory relief as to the Holdings-Gaming License, not the Holdings-Sports License. *Id.* Accordingly, the court will deny SBC's request in the Motion to declare the Holdings-Sports License unenforceable and will address only the Holdings-Gaming License.
[231] Sports ECF No. 33 at APEN1349, ¶ 11.1.

the applicable choice of law. This alone requires the court to reject this argument for lack of proper development.

That said, it is apparent that SBC's argument fails even if Nevada law is applied. SBC makes much of the fact that Holdings did not charge a license fee to Gaming for the use of its technology.[232] SBC argues this demonstrates a lack consideration rendering the Holdings-Gaming License unenforceable.[233] Again, it is unclear why Gaming may void its contract because *Gaming* ostensibly failed to provide sufficient consideration to Holdings. But the failure to assess or to pay money does not, without more, evidence a lack of mutuality of obligation to support a contract. "Consideration is the exchange of a promise or performance, bargained for by the parties."[234] Here, the Holdings-Gaming License granted Gaming a license to sublicense the object code and modify Holdings' source code.[235] While Holdings did not receive a fee for licensing its technology to Gaming, it reaped the benefit of all modifications of the source or object code Gaming developed. These modifications, including any applications, became Holdings' property under the terms of the Holdings-Gaming License, as did any increase in value of that intellectual property.[236] Even SBC acknowledges that the modifications to Holdings' technology were valuable. Thus, the bargained-for exchange of promises by the parties to the Holdings-Gaming License provided sufficient consideration to render that agreement valid and enforceable to the extent that Nevada law governs.

Additionally, an absence of mutuality of obligation at the inception of a contract can be cured by subsequent performance.[237] Holdings and Gaming each performed under the license

---

[232] *Id.* at APEN1349, ¶ 13.1; APEN1352.

[233] The Holdings-Sports License states that Gaming will annually pay Holdings one pound for the use of the technology. Sports ECF No. 34 at APEN1366. Venner also admitted that Holdings licenses its intellectual property "to other entities, usually for no fee or a nominal fee." Adv. ECF No. 301-1 at 3.

[234] *Paxson v. Live Nation Ent., Inc.*, 2025 WL 894634, at *8 (D. Nev. Mar. 21, 2025) (quoting *Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (2012) (en banc)).

[235] Sports ECF No. 33 at APEN1352.

[236] *Id.*

[237] *See Lakeshore Apts., Inc. v. U.S.*, 351 F.2d 349, 351 (9th Cir. 1965) (lack of consideration "immaterial" where promise is fully performed); *see also Kepler v. Eichline (In re Eichline)*,

until Holdings terminated the parties' agreement in August 2022. SBC does not argue that Holdings breached the terms of the Holdings-Gaming License when it terminated that agreement. But again, even if there was a breach of contract, this would not change Holdings' asset into a Gaming asset.

Thus, for the reasons stated, SBC has not demonstrated that the license agreement between Holdings and Gaming was an unenforceable contract, or that the technology was ever Gaming's asset.

### b.  Judicial Estoppel.

SBC urges the court to apply judicial estoppel to bar any assertion that Holdings owned the Miomni Systems.[238] "[T]he purpose of judicial estoppel is to protect the essential integrity of the judicial process and prevent the parties from playing 'fast and loose' with the courts."[239] In addressing whether state or federal law applies where it is alleged that a federal litigant made an inconsistent prior statement in state court litigation, the Ninth Circuit concluded:

> [F]ederal law governs the application of judicial estoppel in federal court. Judicial estoppel enables a court to protect itself from manipulation. The interested party is thus the court in which a litigant takes a position incompatible with one the litigant has previously taken. The tribunal in which the litigant made the first statement could also be interested (there is no reason to think as a general proposition that one statement is more likely than the other to be true), but it is not in a position to do anything about its interest. Therefore, for all practical purposes, the interests of the second court are uniquely implicated and threatened by the taking of an incompatible position....[240]

The doctrine of judicial estoppel provides that "when 'a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply

2011 WL 6180059, at *5 (Bankr. W.D. Wis. Dec. 13, 2011) ("Contracts that allegedly lack consideration may not later be argued to be invalid if the parties perform under the terms of the contract.").

[238] SBC seeks entry of partial summary judgment against Sports only, but requests judicial estoppel be applied against Sports, Gaming, and all individual defendants. Absent authority indicating that granting relief against multiple defendants is appropriate in the context of a summary judgment motion brought against a single defendant, the court will only consider the relief requested as to Sports.

[239] *Freitas v. McCabe, Hamilton & Renny Co.*, 2019 WL 2236074, at *7 (D. Haw. May 23, 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

[240] *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 603–04 (9th Cir. 1996).

36

because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'"[241] Importantly, "[t]he test for judicial estoppel requires the movant to show that…the *same party* has taken two positions…."[242]

SBC's invocation of the judicial estoppel doctrine is, at best, ambiguous and ill developed. It summarily concludes that Venner's and Watt's current statements in the adversary proceeding – that Holdings owns the Miomni Systems – are false. Apart from the citation of two cases, the entirety of its argument is:

> These representations contradict other statements made by Defendant Venner in other proceedings in the U.K. and Delaware. Exhibits 89-90, 95, 182. Indeed, Watt interposed those decisions and foisted them on West Virginia gaming authorities as he sought criminal sanctions against another party as he detailed that Debtor (not Holdings) owned the intellectual property. Playing fast and loose with the facts is why judicial estoppel exists. Exhibit 96. The Court should invoke the doctrine here because Debtor prevailed in the U.K. on the claim that Debtor owned the Miomni Systems.[243]

SBC does not even discuss the prior statements made by Venner and Watt, or how they are inconsistent with Holdings' ownership of the Miomni Systems. Instead, SBC merely cites generally to their current declarations filed in this adversary proceeding. Venner filed a declaration as manager of Holdings stating, "[t]he business of Holdings is solely to own and hold intellectual property ('IP') in the UK, predominately [sic] consisting of software used for gaming and retail purposes, which it then licenses out to other entities, usually for no fee or a nominal fee."[244] He further stated that "[t]he IP was contributed to Holdings when Holdings was organized in 2010 and has been owned by Holdings since."[245] Watt, as "prior manager" of

---

[241] *Mojave Desert Holdings, LLC v. GemCap Lending I, LLC (In re U.S.A. Dawgs, Inc.)*, 831 F. App'x 262, 265 (9th Cir. 2020) (quoting *New Hampshire*, 532 U.S. at 749).
[242] *Sneath v. GMAC Mortg.*, 2010 WL 3860655, at *2–3 (D. Nev. Sept. 27, 2010) [emphasis added].
[243] Adv. ECF No. 418 at 33:24-34:2.
[244] Adv. ECF No. 301-1 at 3, ¶ 11.
[245] *Id.* at 4, ¶ 15.

Gaming, has also filed a declaration stating, "Debtor never owned the IP, it was only a licensee authorized to utilize the IP…."[246]

SBC points generally to five exhibits as evidence that Venner's and Watt's current statements are inconsistent with prior statements. But again, SBC never identifies the specific prior statement(s) at issue. Three of these exhibits are documents from the court in the United Kingdom entered in Gaming's lawsuit against EnterG.[247] As discussed above, Gaming entered into a Platform and Source Option Agreement with EnterG on November 1, 2017, to create a "Miomni Branded Platform" to transact sports betting to be developed using both of their technologies as a "combined solution.[248] Gaming ultimately sued EnterG in the United Kingdom to determine the parties' rights to the Miomni Branded Platform under the November 1, 2017 agreement between the parties. On May 29, 2019, the court entered an injunction against EnterG requiring it to provide information to deactivate the kill switches it inserted within the Miomni Branded Platform.[249] The United Kingdom subsequently entered its transcript of proceedings and judgment on January 24, 2020, finding that EnterG did not terminate its agreement with Gaming, and that Gaming had exercised its option to acquire the Miomni Branded Platform.[250]

SBC directs the court to the injunction (Exhibit 182),[251] the judgment (Exhibit 89),[252] and the subsequent order (Exhibit 90)[253] entered in the EnterG litigation in support of its argument that Venner made statements that contradict Holdings' ownership of the Miomni Systems. Yet, these documents do not reference any statements regarding ownership of the Miomni Systems, and SBC fails to direct the court to any such statements. Rather, the documents detail Gaming's efforts to establish its rights to the Miomni Branded Platform created with, and which used

---

[246] Adv. ECF No. 301-2.
[247] Sports ECF No. 33 at APEN1153.
[248] *Id.* at 1153-1165; APEN1307.
[249] Sports ECF No. 36 at APEN2003-09.
[250] Sports ECF No. 33 at APEN1306-14.
[251] Sports ECF No. 36 at APEN2003-09.
[252] Sports ECF No. 33 at APEN1306-14.
[253] *Id.* at APEN1315-17.

technology from, EnterG. The EnterG Agreement and these exhibits show that Gaming contributed the Miomni Systems to the "combined solution," which became the Miomni Branded Platform under that agreement. Nothing in these documents suggests that any party disputed Gaming's right to sublicense, use, or modify the Miomni Systems under the Holdings-Gaming License. Nor is there any indication that Holdings' ownership of the Miomni Systems was ever raised or contested.

SBC also generically cites to Exhibit 95 in support of its judicial estoppel argument. This exhibit is Venner's declaration filed in the resulting Delaware litigation with DNG in the aftermath of the EnterG dispute. Again, SBC does not specifically identify the statements it believes contradict Holdings' ownership of the Miomni Systems. The court suspects that it is referring to Venner's statement that Gaming "has spent over a decade and millions of dollars developing its source code used in the Platform licensed to BetLucky…" and "licenses products derived from this source code to gaming companies worldwide…."[254] But this is not inconsistent with Holdings' ownership of the technology. SBC continues to ignore the difference between a license to use technology and ownership of that technology. The Holdings-Gaming License specifically provided Gaming the right to sublicense the object code and modify Holdings' source code.[255] Given Gaming's rights under the Holdings-Gaming License, there is nothing inconsistent with Venner's statement in the DNG declaration. Moreover, SBC never develops why this statement is inconsistent with Holdings' ownership of the Miomni Systems, why the ownership was an issue, or how Gaming prevailed on the issue of ownership of the Miomni Systems.[256]

---

[254] *Id.* at APEN1335.

[255] *Id.* at APEN1352.

[256] Moreover, to the extent judicial estoppel extends only to positions taken by the *same party* in the course of litigation, Venner's statements in the Delaware litigation were made in his capacity as representative of Gaming, not Sports. His statements made in this litigation were in his capacity as representative of Holdings. Thus, even if his statements were contradictory, they were not made by the same party, nor were they made by the party which is the subject of the Motion. *Sneath,* 2010 WL 3860655, at *2–3.

Finally, SBC cites to Exhibit 96, an email from Watt to John Myers, a representative of the West Virginia Lottery, dated March 25, 2020. Watt's email advised Myers of Gaming's victory in its litigation against EnterG in the United Kingdom roughly two months earlier. The court assumes that SBC has cited Exhibit 96 for Watt's statement, "This leaves no doubt that Miomni Gaming had all the rights in the Software…"[257] Yet, SBC's reference to Exhibit 96 is no more helpful than the other exhibits as there is no dispute, or contradiction created, that Gaming had rights in the Miomni Systems at that time. This statement, like the other exhibits, does not address the *ownership* of the Miomni Systems. Indeed, it appears directed to the resulting software developed between Gaming and EnterG, and Gaming's acquisition of ownership of that software. SBC's judicial estoppel argument falls far short of establishing the requisite inconsistent statements, or contradictory success achieved, by Gaming in prior litigation.

In summary, SBC's failure to address Holdings' ownership of the Miomni Systems under the separate licenses to Gaming and Sports is inexplicable and fatal to its fraudulent transfer claims. SBC has given the court no reason to ignore the Holdings-Gaming License and the subsequent termination of that license within the context of its fraudulent transfer claims. Moreover, the record demonstrates that Holdings, not Gaming, provided the license of the Miomni Systems to Sports. These documents establish that Holdings owned the Miomni Systems, including all modifications made by Gaming. Certainly for purposes of summary judgment SBC has failed to establish the absence of any genuine dispute that Gaming actually transferred a license to Sports to use the Miomni Systems while it had the ownership or rights to that technology. For these reasons, the court shall deny SBC's motion for summary judgment that Gaming actually or constructively fraudulently transferred the Miomni Systems to Sports under § 548(a) or Nevada law.

---

[257] *Id.* at APEN1343.

**B.    Employees.**

SBC makes several references that Gaming fraudulently transferred its employees to Sports. It does not, however, develop any specific argument in support of a claim for the fraudulent transfer of the employees themselves to Sports. Rather, SBC notes in its discussion of the badges of fraud that Gaming's employees ended up working for Sports.[258] Again, the lack of specificity as to any claim of fraudulent conveyance of the employees would subject SBC's arguments to dismissal for the failure to show how and when Gaming transferred its employees to Sports. SBC fairs no better on summary judgment.

SBC has further provided no analysis reflecting that a debtor's employees are "property" in which a debtor holds an "interest" for purposes of a fraudulent transfer claim. SBC merely posits that there was a transfer by Gaming of its employees to Sports because several employees that had worked for Gaming began working for Sports. This apparently occurred sometime while Gaming was terminating its operations. The court is aware of no authority that employees can be "transferred." Whatever claim the bankruptcy estate may have for Gaming's employees moving to Sports, the court holds that it is not for fraudulent transfer.[259]

**C.    Casino Contracts.**

SBC also argues that Gaming fraudulently transferred existing contracts with the Nevada casinos to Sports for no consideration sometime in the latter half of 2022. As of the entry of the state court judgment in favor of SBC, Gaming had contracts to provide mobile betting applications to the Wynn, South Point, Stations, and Atlantis casinos. Each casino was served a

---

[258] Adv. ECF No. 418 at 15.

[259] *See generally, DBA Distribution Servs., Inc. v. MSL Prods., LLC,* 2010 WL 11591632, at *3 (S.D.N.Y. Sept. 3, 2010) (collecting cases); *Geltzer v. Bloom (In re M. Silverman Laces, Inc.),* 404 B.R. 345, 361 (Bankr. S.D.N.Y. 2009) (debtor had no property interest in services of employees without agreement not to compete and had "nothing to transfer to WL when [debtor] did not stop its former employees from working for WL."); *Orthotec, LLC v. Reo Spineline, LLC,* 438 F. Supp. 2d 1122, 1130 (C.D. Cal. 2006) ("Defendant's mere hiring of former REO employees, absent any allegations or evidence of an assignment of contract, is not considered a transfer or acquisition of REO's assets.") [footnote omitted]; *Atchison, Topeka and Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358, 365 (9th Cir. 1997).

writ of garnishment sometime in August or September 2022, as SBC attempted to collect its judgment from Gaming's income on those casino contracts. Three of the four casinos responded to Gaming in some fashion saying they would honor the writ of garnishment and pay Gaming's outstanding invoices to the sheriff's department. In response, Venner and Watt contacted the casinos advising them that Gaming ceased operations in September 2022. Venner and Watt also advised that Sports would be taking over the casino contracts. Though there is some evidence that Venner and Watt offered to send future invoices through Sports, none of the casinos blindly changed the name on their existing contracts from Gaming to Sports. Instead, the casinos ultimately entered into new contracts with Sports for the same mobile sports betting applications, mostly after Gaming's contracts expired.

Venner largely handled the negotiations with the casinos. Again, there is no direct evidence that Gaming actually transferred any existing casino contract to Sports. However, between September 2022 and February 2023, Venner and Watt negotiated and executed new contracts for Sports to provide the same mobile betting technology and application that Gaming had previously provided.

### 1. Wynn.

Wynn's contract with Gaming was scheduled to expire in December 2021, prior to entry of the SBC judgment. Beginning in November 2021, Gaming attempted to enter into a third amendment of its agreement with Wynn and sent several draft contracts for their consideration. An email string between Venner and Charlie Stone with Wynn shows that on December 13, 2021, Venner forwarded another version of the proposed amendment, but stated for the first time that the "group companies" were "reorganizing" and that Sports would be providing the mobile betting applications.[260] The record also includes a version of the third amendment titled Third Amendment and Assumption and Assignment Agreement.[261] Unlike the other versions of the third amendment, this version included Sports as a signatory and provided:

---

[260] Sports ECF No. 34 at APEN 1469-70.
[261] *Id.* at APEN1481-82.

WHEREAS, Miomni Gaming desires to assign all of its rights, title, duties, obligations, and interest under the Agreement to Miomni Sports, and Miomni Sports is willing to accept and assume all of Miomni Gaming's rights, title, duties, obligations, and interest under the Agreement, pursuant to the terms and conditions set forth herein; and

WHEREAS, pursuant to Section 14.S the Agreement, Miomni Gaming may not assign the Agreement without the prior consent of Wynn.[262]

Watt signed this document on behalf of Gaming and Sports. Stone replied that Sports would have to go through Wynn's vendor protocol.[263]

Wynn never signed the version of the amendment that included an assignment to Sports. In fact, the parties failed to reach any agreement until roughly a year later when Wynn signed a new Licensing and Managed Service Agreement with Sports effective December 1, 2022.[264] However, on September 8, 2022, Watt again notified Wynn that "[t]he group have re-organised and we are trading through Miomni Sports Ltd."[265] During this same email exchange, Watt further informed Wynn that Gaming had ceased "trading" while it appealed SBC's judgment and attempted to convince Wynn that its existing contract was with Sports.[266] This effort was also unsuccessful, however, as Wynn recognized its prior contract had been with Gaming and advised that it would pay the invoice to the sheriff under SBC's writ of garnishment.

The above establishes that Gaming may have sought to transfer its contract with Wynn to Sports in late 2021, but it never did so. Rather, after Gaming's contract with Wynn expired Sports entered into a new contract to provide similar, if not the same, services to Wynn. SBC has not identified any transfer of the expired contract between Gaming and Wynn. As the record does not show that Gaming transferred Wynn's contract to Sports, SBC has failed to establish a fraudulent transfer of the Wynn contract.

---

[262] *Id.* at APEN1481.
[263] *Id.* at APEN1469.
[264] Sports ECF No. 35 at APEN1740-1764. Although the document is marked "confidential," it was not among the documents filed by SBC under seal.
[265] *Id.* at APEN1658.
[266] *Id.* at APEN1656.

In support of its argument, SBC also cites to three Sports invoices addressed to Wynn filed under seal at Exhibits 158-160.[267] The invoices at Exhibits 158-160 are all dated June 12, 2022, nearly six months before the Sports-Wynn Agreement was signed. Those invoices are for "Platform Licensing" for the months of October, November, and December – no year is provided. Again, SBC assumes that these invoices are actually for October through December, 2022. Yet, SBC does not address the inconsistencies in the invoices: how Sports could issue invoices in June 2022 when it was not yet under contract with Wynn or how there is no genuine dispute for purposes of summary judgment that the invoices are for October, November, and December of 2022, since no year is stated on the invoices. And, assuming the invoices are for 2022, the question remains - what right to payment from Wynn did Gaming allegedly hold in October, November, and December of that year, after its license to use the Miomni Systems was terminated in August 2022?

Most importantly, SBC has not provided any evidence that Gaming actually transferred any existing right to payment from Wynn to Sports.[268] Again, SBC has failed to establish a transfer of the debtor's interest in property.

## 2. South Point.

Watt also attempted to persuade South Point to transfer the Gaming-South Point Agreement to Sports.[269] As with Wynn, South Point declined and stated it would pay the amounts due to Gaming pursuant to the writ of garnishment. However, South Point's contract with Gaming was set to expire at roughly the same time - September 5, 2022. Ten days after

---

[267] Exhibits 158-160 at APEN1766-1768 (under seal).

[268] In the email string cited by SBC, Aldrian of Wynn confirmed, after a call with Watt and Venner, that "[Wynn] should continue to pay under the prior arrangement with Miomni Gaming until a new agreement is signed. To that end, you also agreed that until [Wynn] signs a new agreement with Miomni Sports, [Wynn] can pay amounts due to Miomni Gaming under the prior agreement to the Sheriff, in compliance with the Writ." Sports ECF No. 35 at APEN1654. This evidence demonstrates that Wynn paid Clark County, not Sports. *But see* Exhibit 161 (under seal), APEN1769-73 (December 2022 Wynn emails referencing the holding of payments to Sports).

[269] Sports ECF No. 34 at APEN1584.

Gaming's contract expired South Point entered into a new contract with Sports, effective as of September 6, 2022.[270] As with Wynn, there is no evidence that Gaming transferred its contract with South Point to Sports. Rather, the evidence shows that South Point entered into a new contract with Sports after the expiration of its contract with Gaming. There being no transfer of an existing contract, SBC has failed to establish a fraudulent transfer relating to the expired South Point contract.

### 3.    Atlantis.

The opposite occurred with the Gaming-Atlantis Agreement. Gaming's current contract at that time with Atlantis did not expire until March 2023. Nonetheless, by early September 2022, Venner had started efforts to convince Atlantis to sign a new contract with Sports for its mobile sports betting application though the contract with Gaming had yet to expire. At that time Atlantis sought additional mobile betting services that it insisted be included in any new contract. The parties proceeded to negotiate. The evidence shows that the Atlantis representatives requested on multiple occasions that Sports simply modify the existing contract with Gaming, in lieu of requiring a new contract with Sports.[271] Instead, Sports declined, reiterating that a new contract with Sports was required.[272]

On February 6, 2023, Atlantis signed a new agreement with Sports to use its mobile race wagering platform. SBC has failed to establish that Gaming ever transferred its contract with Atlantis to Sports.

### 4.    Stations.

Also in early September 2022, Watt contacted Stations introducing Sports as the new entity to operate the mobile betting applications.[273] Later, Watt advised Stations that Gaming had ceased operating as of September 1, 2022.[274] Kerry Venner further advised Stations that Sports

---

[270] Sports ECF No. 35 at APEN1614; APEN1621-1641.

[271] *Id.* at APEN 1787-94.

[272] Sports ECF No. 37 at APEN2127-31.

[273] *Id.* at APEN2096.

[274] *Id.* at APEN2097-98.

was a new entity, and not simply Gaming operating under new name.[275] As with Atlantis, Stations' representatives similarly asked if Stations' existing contract with Gaming could be modified to simply replace Gaming with Sports.[276] Watt assured Stations that Sports could not "sign up to" Gaming's contract but instead needed its own new contract.[277]

On November 29, 2022, Stations signed its contract with Sports, made effective as of September 1, 2022.[278] SBC has failed to establish that Gaming ever transferred its contract with Stations to Sports.

### 5. Casino payments after expiration of Gaming's contracts and the new contracts with Sports.

SBC also alleges that the casinos wrongfully paid Sports for services during the varying periods after the casino contracts with Gaming expired or otherwise ended and the new contracts with Sports were signed. SBC contends that Wynn withheld the payments for September through November 2022 when there was no written effective contract with either Gaming or Sports. The period in which there was no effective written contract with South Point only ran between September 6-27, 2022. Stations had no effective contract between September 2022 until late November 2022.[279] Atlantis continued to utilize the mobile sports betting application for the longest period without a written contract, between September 2022 and February 2023.[280] But once again, these allegations do not support a conclusion that *Gaming* transferred any property to Sports.

SBC assumes that Gaming was due all revenue for the casinos' use of the Miomni Systems prior to their entry into contracts with Sports. Yet, Holdings terminated Gaming's license to use the Miomni Systems as of August 31, 2022. Though SBC strongly disputes Sports's license to use the Miomni Systems, it was Sports that held the license after Holdings

---

[275] Exhibit 189 (under seal) at APEN2061.
[276] Exhibit 190 (under seal) at APEN2070.
[277] *Id.*
[278] Exhibit 191 (under seal) at APEN2072-94.
[279] Exhibit 190 (under seal) at APEN2066.
[280] Sports ECF No. 35 at APEN1819.

terminated Gaming's license to use the Miomni Systems, including the mobile sports betting applications. The validity of that termination and any causes of action relating to the Holdings-Gaming License are not before the court.

For these reasons, the court must deny summary judgment on counts one, two and eight of the Complaint for SBC's failure to prove that Gaming transferred any interest in property to Sports. Accordingly, the court will not address the remaining factors under the 11 U.S.C. § 548(a)(1) and N.R.S. 112.180(1)(a) analyses.

## III. Successor Liability.

SBC also states a claim to impose successor liability on Sports for Gaming's debts. The bankruptcy court looks to state law to determine questions of successor liability.[281] Nevada's default rule is that "acquirors of assets have no successor liability."[282] Accordingly, a litigant seeking to impose successor liability must prove by a preponderance of the evidence that "'one of the following four exceptions applies: (1) [t]he purchasing corporation expressly or impliedly agrees to assume the liability; (2) [t]he transaction amounts to a 'de-facto' consolidation or merger; (3) [t]he purchasing corporation is merely a continuation of the selling corporation; or (4) [t]he transaction was fraudulently entered into in order to escape liability.'"[283] Sports argues that all but the first exception are met here.

As to the fourth exception, a fraudulent transaction to escape liability, SBC only referred the court in its Motion to its arguments in support of fraudulent transfer. Accordingly, for the

---

[281] *Eachpole*, 2025 WL 351823 at *128. As to its successor liability and alter ego claims, SBC blindly assumes that Nevada law governs the relationship between Gaming and Sports, both of which are British entities. Certainly, a federal court applies the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). So, Nevada law does govern the initial choice of law question. However, "many jurisdictions addressing choice of law issues related to veil-piercing claims against foreign entities apply the law of the state of incorporation." *Renneger v. Aquawood, LLC*, 2022 WL 20854492, *19 (S.D. Iowa Mar. 29, 2022). Here, that would be the United Kingdom. The Motion fails to discuss the choice of law question or British law on piercing the corporate veil or successor liability. The court need not resolve the choice of law question at this point, however, as it appears that SBC is not entitled to summary judgment on either claim if Nevada law applies.
[282] *Id.* at *129.
[283] *Id.* (quoting *Pac. Cheese Co. v. Advanced Coil Tech., LLC*, 2015 WL 7568582, at *3 (D. Nev. Nov. 24, 2015)).

same reasons set forth above, SBC's arguments fail under a successor liability cause of action as well.

The absence of any identifiable transfer of property between Gaming and Sports is also fatal to the second successor liability exception. Under the de facto merger exception, successor liability "applies when the successor corporation has essentially merged with the *seller* corporation, even though there was no actual merger."[284] "In Nevada, '[t]o determine whether there has been a de facto merger, courts apply a four-factor test and consider: (1) whether there is a continuation of the enterprise, (2) whether there is a continuity of shareholders, (3) whether the seller corporation ceased its ordinary business operations, and (4) whether the *purchasing* corporation assumed the *seller's* obligations.'"[285]

The sole case relied upon by SBC for its de facto merger argument reveals a fundamental assumption in the analysis: some transfer of property occurred between the parties at issue.[286] In its discussion of the factors examined in a de facto merger analysis, the *Village Builders* court observed that giving the factors equal weight "properly balances the successor corporation's rights to be free from liabilities incurred by its predecessor, with the important interest involved in ensuring that ongoing businesses are *not able to avoid liability by transferring their assets* to another corporation that continues to operate profitably as virtually the same entity."[287] But, as discussed above, there was no transfer of property between Gaming and Sports. Here, each of Gaming and Sports entered into its own license agreement with Holdings for use of Holdings' technology. Sports cannot be Gaming's successor because it received no property from Gaming in a sale or other transfer.

---

[284] *Id.* [emphasis added].

[285] *Id.* (quoting *Pac. Cheese*, 2015 WL 7568582 at *3) [emphases added].

[286] *Vill. Builders 96, L.P. v. U.S. Lab'ys, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005) ("The de facto merger exception permits courts to hold the purchaser of a business's assets liable for the seller corporation's conduct when the parties have essentially achieved the result of a merger although they do not meet the statutory requirements for a de jure merger.").

[287] *Id.* at 1088 [emphasis added].

SBC's third successor liability argument is similarly unpersuasive. In Nevada, "a plaintiff must meet the following two requirements to justify bringing a sale of assets within the purview of the mere continuation exception to the general rule: (1) only one corporation remains after the transfer of assets; and (2) there is an identity of stock, stockholders, and directors between the two corporations."[288] Again, the case cited by SBC in support of its argument requires a transfer of assets to satisfy the mere continuation exception.[289] Again, there was no transfer of assets between Sports and Gaming. On summary judgment, SBC's successor liability claim must fail for the same reason its fraudulent transfer claims fail.

## IV. Alter Ego.

SBC also seeks to hold Sports liable for Gaming's debts as Gaming's alter ego. Under Nevada law,[290] a plaintiff asserting a cause of action for alter ego "must show that the subsidiary corporation 'is so organized and controlled, and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of [the parent corporation].'"[291] Moreover, in Nevada, "the alter ego doctrine can be a separate cause of action when the claim is filed as a means for a judgment creditor to pursue the execution of a prior judgment."[292] Though SBC holds a prior judgment against Gaming, it is proceeding in this litigation on the estate's claims it acquired, not its claims as a judgment creditor.[293] Nevada courts have declined to recognize an independent cause of

---

[288] *Id.* at 1090-91 (citing *U.S. v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992)).

[289] *Id.*

[290] *See* footnote 282, *supra.*

[291] *Parker v. Titan Mining (US) Corp. (In re Star Mountain Res., Inc.)*, 2022 WL 2294175, at *12 (Bankr. D. Ariz. June 22, 2022), *reconsideration denied sub nom. Star Mountain Plan Tr. v. Titan Mining (US) Corp.*, 2023 WL 2355916 (D. Ariz. Feb. 3, 2023) (quoting *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P.2d 227, 229 (Nev. 1979)); *see also Ene v. Graham,* 546 P.3d 1232, 1236 (Nev. 2024) (quoting *LFC Mktg. Grp., Inc. v. Loomis,* 8 P.3d 841, 845 (Nev. 2000)) ("'[A]lthough corporations are generally to be treated as separate legal entities, the equitable remedy of piercing the corporate veil may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual.'").

[292] *Magliarditi v. TransFirst Grp., Inc.*, 2019 WL 5390470, at *2 (Nev. Oct. 21, 2019).

[293] In its Order on Emergency Request for Temporary Restraining Order, Preliminary Injunction and Stay Relief, the court denied SBC's requests for relief in part because the alter ego and fraudulent transfer causes of action are property of the estate, which only the chapter 7 trustee has standing to pursue. Adv. ECF No. 27 at 7:14-18.

action for alter ego outside this narrow exception for judgment creditors, concluding instead that alter ego is only a remedy.[294] Therefore, in order for SBC to prevail on independent alter ego claims against Sports under the Complaint, those claims must be accompanied by additional viable causes of action.[295] As detailed above, SBC's causes of action for constructive and fraudulent transfer fail for lack of an identifiable transfer of any property by the debtor. It follows, then, that SBC's request for summary judgment on its alter ego claims must also fail, since there are no claims to which the remedy can apply.

## V.  Adverse Inferences.

SBC closes its Motion by arguing that "an adverse inference should be issued because of Sports' misconduct" in the course of discovery.[296] In support of its request, SBC cites Ninth Circuit authority on adverse inferences resulting from invocation of a party's Fifth Amendment privilege against self-incrimination.[297] That is not the circumstance before the court. More generically, adverse inferences have been drawn as a discovery sanction based:

> on the reasonable assumption that the party resisting discovery is doing so because the information sought is unfavorable to its interest. In such a case, the sanction merely serves as a mechanism for establishing facts that are being improperly hidden by the party resisting discovery.[298]

The Eighth Circuit Court of Appeals has examined the circumstances under which courts may draw a negative inference based on a defendant's failure to produce documents:

---

[294] *See NewRez LLC v. Haddad*, 2024 WL 3605838, at *2 (D. Nev. July 30, 2024) (dismissing alter ego claim to the extent it was "pled as a separate claim for relief," instead construing alter ego "as merely a separate theory of liability for any claim to which it can apply.").

[295] *Magliarditi*, 2019 WL 5390470 at *3 (quoting *Maxus Liquidating Trust v. YPF S.A., et al.*, 2019 WL 647027, at *2 (Bankr. D. Del. Feb. 15, 2019)) ("'When coupled with allegations of another wrong, such as a breach of fiduciary duty or a fraudulent conveyance, alter ego can constitute an independent claim.'").

[296] Adv. ECF No. 418 at 36:3-4.

[297] *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264-65 (9th Cir. 2000); *Nat'l Audit*, 367 B.R. at 216-17.

[298] *Gibson v. Chrysler Corp.*, 261 F.3d 927, 948 (9th Cir. 2001), *holding modified by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) (citing Fed. R. Civ. P. 26(g)(3), 37(b)(2)(A); *Chilcutt v. United States*, 4 F.3d 1313, 1324 (5th Cir. 1993)).

> [I]n certain circumstances, a negative inference arises from a defendant's failure to produce documents shown to have been in his possession. The inference is that the documents would have been damaging to the defendant. This adverse inference rule is applicable when the following factors are present: (1) it appears that the documentary evidence exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; (4) it appears that there has been actual suppression or withholding of evidence. The unfavorable inference resulting from refusal to produce documents is applicable when the withholding party has been called on in the interest of the truth to produce the documents.[299]

SBC argues an adverse inference is appropriate because Sports (1) produced few documents in response to SBC's discovery requests, and (2) did not appear for its scheduled deposition. SBC does not elaborate in its discussion what adverse inferences the court should draw. By combing through the Motion, the court has found two instances in which SBC suggests an adverse inference should be taken: (1) Sports's alleged failure to observe corporate formalities; and (2) the employment of Gaming employees by Sports and vice versa.

As to individuals employed by both Sports and Gaming, SBC's request for an adverse inference follows its citation to over one dozen exhibits in evidence which purportedly support its assertion that "Debtor and Sports employed the same key-employees [sic]."[300] Nevertheless, Sports urges the court to adopt an adverse inference in favor of SBC due to Sports's refusal during discovery to provide a list of its employees.[301] Again, an adverse inference "serves as a mechanism for establishing facts that are being improperly hidden by the party resisting discovery." Importantly, the evidence the defendant refuses to disclose must not be available to the party seeking its production. SBC has demonstrated that not only does it have access to the information sought, it has presented that evidence in support of its Motion. Accordingly, an adverse inference is inappropriate on the matter of Sports's employee list. Even more importantly, such an adverse inference would not affect the court's ruling on SBC's claim that Gaming fraudulently transferred employees to Sports.

---

[299] *Evans v. Robbins*, 897 F.2d 966, 970 (8th Cir. 1990) [internal citations omitted].
[300] Adv. ECF No. 418 at 15:22.
[301] *Id.*

As for Sports's failure to observe corporate formalities, SBC asserts that Sports's failure to participate in discovery has prevented SBC from determining whether Sports complied with certain sections of the Nevada state statutes governing private corporations. However, SBC opens its discussion by stating, "There are so many examples of Defendants Venner, Watt, and Konstam failing to observe corporate formalities on behalf of their various Miomni Entities, that SBC only brings attention to the most glaring examples."[302] These appear to be conflicting statements. If examples of a failure to observe corporate formalities allegedly abound, then once again SBC has demonstrated that it has access to the information it seeks, and an adverse inference is improper. Here also, the adverse inference requested is not material and would not affect the court's ruling on summary judgment as to either the successor liability or alter ego claims.

## Conclusion

SBC has gone to considerable lengths to establish a concerted effort by Venner and Watt to end Gaming's operations after entry of the state court judgment. Moreover, the evidence presented shows that these efforts, utilizing Holdings and Sports, began well before the conclusion of the state court trial. Such efforts left Gaming with no ongoing business or use of the mobile sports betting application to service its casino clients. Yet, at the very minimum, the record amply reflects multiple genuine disputes as to Gaming's ownership of the Miomni Systems and whether Gaming transferred any of its assets to Sports. For this reason, the court must deny summary judgment on SBC's claims for fraudulent transfer. These disputed questions also preclude entry of summary judgment on SBC's claim for successor liability. Moreover, because SBC has not established Sports's liability for any fraudulent transfer, any claim for alter ego is premature. Finally, genuine issues of material fact exist such that the court must deny summary judgment on SBC's claim for declaratory relief as to the validity and enforceability of the Holdings-Gaming License.

---

[302] Adv. ECF No. 418 at 27:15-17.

For these reasons, the court will enter a separate order denying the Motion for Partial Summary Judgment.

* * * * *

Copy sent to all parties and/or their counsel via CM/ECF Electronic Notice.

# # #